UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIAA-CREF INDIVIDUAL &, | : | |
| INSTITUTIONAL SERVICES, LLC, | : | |
| | : | Case No.: 4:20-cv-00917 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID AHLQUIST, | : | |
| | : | |
| Defendant. | : | |

---

**DEFENDANT'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1) OR, IN THE
ALTERNATIVE, MOTION TO COMPEL ARBITRATION
<u>AND SUPPORTING MEMORANDUM OF LAW</u>**

---

## <u>TABLE OF CONTENTS</u>

SUMMARY ……………………………………………………………………………..1-2

MEMORANDUM OF LAW…………………………………………………………………..2-20

INTRODUCTION………………………………………………………………………2-5

ARGUMENT………………………………………………………………………..6-20

    I.      MOTION TO DISMISS…………………………………………………...6-9

      A.  Mr. Ahlquist's Covenants Expire On May 26, 2020……………………………..6-8

      B.  The Covenant Cannot Be Extended Through The Agreement……………………...8-9

    II.      MOTION TO COMPEL ARBITRATION IN THE ALTERNATIVE…………...9-20

      A.  The FINRA Rules Are Directly At Issue…………………………………………11-16

        1.    The FINRA Code Governs This Dispute……………………………………11-12

        2.    FINRA Protects Clients' Rights When Their Broker Changes Firms………..12-15

        3.    The Agreement's Liquidated Damages Provision Violates FINRA Rules…..15-16

      B.  The Parties Are Actively Arbitrating These Issues in FINRA…………………...16-17

      C.  TIAA Is Using This Case To Obtain Impermissible Discovery…………………17-20

CONCLUSION………………………………………………………………………......20

## <u>TABLE OF AUTHORITIES</u>

- 9 U.S.C. §§ 1 *et seq*……………………………………………………………10-11, 16, 18

- <u>Am. Med. Ass'n v. Bowen</u>, 857 F.2d 267, 270 (5th Cir. 1988)……………..……………6

- <u>AT&T Tech., Inc. v. Communications Workers of America</u>, 475 U.S. 643, 648 (1986)…18

- <u>Cantella & Co., Inc. v. Goodwin</u>, 924 S.W.2d 943, 944 (Tex. 1996) (orig. proceeding) (per curiam)………………………………………………………………………………...16

- <u>Cardinal Personnel, Inc. v. Schneider</u>, 544 S.W.2d 845, 846 (Tex. Civ. App. 1976)…..8-9

- <u>Cent. States Logistics, Inc. v. BOC Trucking, LLC</u>, 573 S.W.3d 269 (Tex. App. - Houston [1st Dist.] 2018), <u>reh'g denied</u> (Dec. 13, 2018), <u>review denied</u> (Oct. 4, 2019)…………….8

- <u>Feldman/Matz Interests, L.L.P. v. Settlement Capital Corp.</u>, 140 S.W.3d 879, 885 (Tex. App.- Houston [14th Dist.] 2004)…………………..……………………………………17

- FINRA Code Rule 13100………………………………………………………………….1

- FINRA Code Rule 13200………………………………………………………..1, 11-12

- FINRA Code Rule 13209………………………………………………………………...16

- FINRA Code Rule 13510………………………………………………………………5,17

- FINRA Code Rule 13804………………………………………………………1-2, 5, 7, 12

- FINRA Code Rule 2140……………………………………………………………………13

- FINRA Regulatory Notice 19-10………………………………………………………...14

- <u>First Options of Chi., Inc. v. Kaplan</u>, 514 U.S. 938, 946-47 (1995)……………………10

- <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20, 21–25 (1991)……………………10

- <u>Henry F. Coffeen III Mgmt., Inc. v. Musgrave</u>, 2016 WL 6277375, at *4 (Tex. App.- Ft. Worth Oct. 27, 2016)…………………………………………………………………6

- <u>IKON Office Sols., Inc. v. Furnish</u>, 2007 WL 9702416 (W.D. Tex. Oct. 31, 2007), <u>report and recommendation adopted,</u> 2008 WL 11408513 (W.D. Tex. Feb. 11, 2008)………….9

- <u>In re Am. Homestar of Lancaster, Inc.</u>, 50 S.W.3d 480, 484 (Tex. 2001)…………………10

- <u>In re FirstMerit Bank</u>, 52 S.W.3d 749, 753-54 (Tex. 2001) (orig. proceeding)…………...16

- <u>In re Merrill Lynch</u>, 131 S.W.2d 709, 712 (Tex.App – Dallas 2004)…………………….11

- <u>In re Odyssey Healthcare, Inc.</u>, 310 S.W.3d 419, 422 (Tex. 2010)………………………16

- <u>In re Scott</u>, 100 S.W.3d 575, 579 (Tex.App.-Ft. Worth 2003) (orig. proceeding)……….10

- <u>In re Stanford Grp. Co.</u>, 273 S.W.3d 807, 815 (Tex. App.- Houston [14th Dist.] 2008)…..18

- <u>Jack B. Anglin Co., Inc. v. Tipps</u>, 842 S.W.2d 266, 269-70 (Tex. 1992) (orig. proceeding)……………………………………………………………………...10

- <u>Leath v. Tracer Const. Co.</u>, 2009 WL 8188138, at *8 (E.D. Tex. Aug. 18, 2009)………..6

- <u>Leon's Fine Foods, Inc. v. McClearin</u>, 2000 WL 277135, at *1 (Tex. App.- Dallas Mar. 15, 2000)…………………………………………………………………………………6

- <u>Malibu Media, LLC v. Doe</u>, 2019 WL 4003086, at *2 (W.D. Tex. Aug. 23, 2019)………19

- NASAA Statement on Brokerage Account Transfers (November 19, 2001)……………..13

- NASD News Release (December 26, 2001)……………………………………………...13

- NASD Notice to Members 01-36………………………………………………………..12-13

- <u>Peat Marwick v. Haas</u>, 818 S.W.2d 381 (1991)………………………………………15-16

- <u>Prudential Sec. Inc. v. Marshall</u>, 909 S.W.2d 896, 899 (Tex. 1995)………………………10

- <u>Rachal v. Reitz</u>, 403 S.W.3d 840, 842 (Tex. 2013)………………………………………16

- <u>Rimes v. Club Corp. of Am.</u>, 542 S.W.2d 909, 912 (Tex. Civ. App. 1976), <u>writ refused NRE</u> (Jan. 12, 1977)……………………………………………………………………..1,7

- <u>Salvano v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 85 N.Y.2d 173, 180, 647 N.E.2d 1298 (1995)……………………………………………………………………...10,19

- Securities and Exchange Commission IM-2110-7………………………………...…13

- <u>Shearson Lehman Bros., Inc. v. Kilgore</u>, 871 S.W.2d 925, 928 (Tex. App.—Corpus Christi 1994) (orig. proceeding)…………………………………………………………………17

- <u>Stewart Title Guar. Co. v. Mack</u>, 945 S.W.2d 330, 333 (Tex. App.—Houston [1st Dist.] 1997, writ dism'd w.o.j.)……………………………………………………………………10

- Tex. Civ. Prac. & Rem. Code § 171.001…………………………………………………10

- <u>Thompson v. United States</u>, 2007 WL 1412308, at *3 (N.D. Tex. Apr. 19, 2007), <u>report and recommendation adopted,</u> 2007 WL 1536933 (N.D. Tex. May 21, 2007)……………6

- <u>UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.</u>, 660 F.3d 643, 648-49 (2d Cir. 2011)………………………………………………………………………………..10

- <u>Vaden v. Discover Bank</u>, 556 U.S. 49, 1271 (U.S. 2009)………………………………..18

- <u>Volt Info. Sciences v. Leland Stanford Jr. Univ.</u>, 489 U.S. 468, 476 (1989)…………18-19

- <u>Weatherford Oil Tool Co. v. Campbell</u>, 340 S.W.2d 950, 953 (Tex. 1960)………………….............................................................................1,6

- <u>Williams v. Fid. Warranty Servs., Inc.</u>, 2020 WL 2086655, at *3 (S.D. Tex. Apr. 30, 2020)………………………………………………………………………………....9

- <u>Wilson v. Chemco Chem. Co.</u>, 711 S.W.2d 265, 268 (Tex. App.- Dallas 1986)…………...1

Defendant, David Ahlquist ("Defendant" or "Ahlquist"), by counsel, respectfully submits this Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 12(b)(1) or, in the alternative, Motion to Compel Arbitration.

## SUMMARY

Plaintiff, TIAA-CREF Individual & Institutional Services, LLC ("TIAA") has made this last-minute court filing in an attempt to extend the terms of a restrictive covenant that **expires on May 26, 2020** – a mere eight days from the date of this filing – and most likely before the Court will have had the opportunity to rule on TIAA's request for injunctive relief, which would render TIAA's request moot.  Texas law clearly maintains that injunctive relief is not available after the expiration of Mr. Ahlquist's restrictive covenants.[1]  Moreover, the Court is unable to extend the temporal scope of Mr. Ahlquist's restrictive covenants.[2]  Without any legal recourse available to TIAA, there are no grounds to maintain this action in Court, particularly when the parties have a valid and binding arbitration agreement and are **presently arbitrating** these same issues.

TIAA and Mr. Ahlquist are both bound by the Financial Industry Regulatory Authority ("FINRA") Code, which establishes a requirement for FINRA Members[3], such as TIAA, to arbitrate disputes with FINRA Associated Persons[4], such as Mr. Ahlquist, in FINRA Dispute Resolution.[5]  One limited, and temporary, exception to this requirement is contained in Rule 13804

---

[1] See Weatherford Oil Tool Co. v. Campbell, 340 S.W.2d 950, 953 (Tex. 1960).
[2] Rimes v. Club Corp. of Am., 542 S.W.2d 909, 912 (Tex. Civ. App. 1976), writ refused NRE (Jan. 12, 1977) (a court will not "extend the period provided in a restrictive covenant contained in an employment contract" and holding that the trial court abused its discretion by temporarily enjoining former employees because former employer could not show a probable right of recovery when the restrictive covenant had expired); see also Wilson v. Chemco Chem. Co., 711 S.W.2d 265, 268 (Tex. App.- Dallas 1986) ("The covenant's own terms provide that it is to run for one year from termination of the agreement.  The trial court may not enlarge the time of the covenant's restriction from the period stated in the contract.").
[3] See Rule 13100 (q) of the FINRA Code (attached as Ex. **1**) (definition includes "any broker or dealer admitted to membership in FINRA").
[4] See Rule 13100 (b) and (u) of the FINRA Code (attached as Ex. **1**) (definition includes "[a] natural person who is registered or has applied for registration under the Rules of FINRA").
[5] See Rule 13200(a) of the FINRA Code (Ex. **2**).

of the FINRA Code.[6]  Pursuant to Rule 13804, a FINRA Member can seek a <u>temporary</u> injunction

in court against a FINRA Associated Person, and, if a <u>temporary</u> injunction is granted, then, within

15 days, a hearing will be held before a FINRA Arbitration Panel who determines if a <u>permanent</u>

injunction should be granted.  If temporary injunctive relief is denied, there will be no permanent

injunction hearing.  In either event, the parties will proceed in FINRA arbitration on the FINRA

Member's request for monetary damages.  Therefore, under the FINRA Code, TIAA is only

permitted in Court for the sole purpose of requesting a temporary injunction.

Pursuant to the parties' arbitration agreement,  TIAA has already filed an arbitration action

with FINRA Dispute Resolution, titled <u>TIAA-CREF Individual & Institutional Services, LLC v.</u>

<u>Ahlquist, et al.</u>, FINRA No. 20-00841 ("FINRA Action"), where it is seeking liquidated damages

based on a purported breach by Mr. Ahlquist of the Confidentiality and Non-Solicitation

Agreement ("Agreement")- the same allegations it proffers in this Court action.[7]  The parties are

actively proceeding in that arbitration and have already entered the discovery phase.

Given that Mr. Ahlquist's restrictive covenants expire on May 26, 2020 and cannot be

extended, Mr. Ahlquist requests that the Court dismiss TIAA's claims.  In the alternative, Mr.

Ahlquist requests that the Court compel the parties to proceed with the pending FINRA Action,

pursuant to the parties' agreement to arbitrate.  Mr. Ahlquist further states:

## **MEMORANDUM OF LAW**

## **INTRODUCTION**

TIAA filed this action on March 12, 2020[8], which was over nine months after Mr.

Ahlquist's final day of employment as a TIAA employee on May 26, 2019[9] and months after it

---

[6] <u>See</u> Rule 13804(a) of the FINRA Code (Ex. **3**).
[7] <u>See</u> Statement of Claim at 8 - 10 (Ex. **4**).
[8] <u>See</u> Complaint (Docket No. 1).
[9] <u>See</u> Docket No. 1 at ¶ 12.

learned of the alleged violations of the Agreement.[10]  TIAA knew, at the time of filing, that the restrictive covenants contained in the Agreement expired on May 26, 2020.  TIAA's delayed filing demonstrates that no urgent or irreparable circumstances exist that would necessitate the Court's consideration of its request for injunctive relief and/or expedited discovery.  Even after TIAA filed this untimely action, and knowing that Mr. Ahlquist's restrictive covenants would be imminently expiring, TIAA expressed no urgency in proceeding. It did not seek a temporary restraining order[11], and it deliberately waited for weeks until it even attempted to serve Mr. Ahlquist.[12]

The FINRA Action is now well underway and TIAA has already served comprehensive discovery on Mr. Ahlquist, consisting of 26 separate requests for documents and 20 separate requests for information.[13]  Mr. Ahlquist has also filed his Answer[14] where he asserted that he did not violate (regardless of enforceability) the Agreement.  Mr. Ahlquist provided statements from 11 clients, which demonstrate that he did not breach any purported obligations owed to TIAA; that he did not solicit business; that clients were initiating contact with him; and that clients decided to transfer their accounts to his new employer so that they could continue working with him:

- **C. Grant Willson**: "David did not initiate contact with me after he left TIAA. He did not initiate the discussion about continuing to work together, and he did not try to sell me on his new employer. Rather, I made the decision to contact him, I asked him about continuing to work together, and I made the decision to transfer my account to him. He did not solicit my business. I solicited his service."[15]

- **Jeannette McBrearty**: "David never asked me, or solicited me, to transfer the account…There was no question that we would be keeping the account with David based on the relationship that we had with him, and based on how poorly TIAA

---

[10] See Docket No. 1 at ¶¶ 17-18.
[11] See TIAA's Motion for A Preliminary Injunction And Expedited Discovery (Docket No. 3).
[12] See TIAA's Motion for Substituted Service of Process (Docket No. 9 at ¶ 1).  It is clear from the process server's affidavit that the process server had attempted to serve on the wrong residence.
[13] See Claimant's First Request for Production of Documents and Information Directed to Respondents (Ex. **5**).
[14] See Respondents, Raymond James & Associates, Inc., and David Ahlquist, Answer to Claimant's, TIAA-CREF Individual and Institutional Services, LLC, Statement of Claim (Ex. **6**).
[15] See Declaration of C. Grant Willson (Ex. **7** at ¶ 7; Ex. **6** at Ex. 2, ¶ 7).

handled his departure. I contacted David and I asked him if he could manage the account at his new company. I was not solicited."[16]

- **Paula Smith**: "David never asked me to transfer my account to Raymond James. I asked him questions and he answered those questions. I asked to schedule a meeting with him and he scheduled that meeting. He did not ask me to transfer my account or solicit my account in any way…I transferred my account to Raymond James because I had no intention of losing David as my financial advisor."[17]

- **Richard Babaian**: "I searched for David on the internet and found that he had taken a position with Raymond James. I then contacted David because I wanted to reconnect with him…David never asked or solicited me to invest with him at Raymond James. To the contrary, David actually recommended that I keep my TIAA investments intact because it made the most sense to continue with the financial strategies that David had established for me while he was working at TIAA…While I did not transfer my TIAA account to David, I do have other investments with him at Raymond James. He did not solicit this business either."[18]

- **Emma Del Frate**: "I found David's phone number and I called him…I asked David if he could still manage my investments. He did not solicit me."[19]

- **Stephanie Diaz**: "David did not contact me to let me know that he had left TIAA… I contacted him and asked him if we could still work together even though he had taken a different job…He did not solicit me or ask me to transfer my money out of TIAA. Given our relationship, it was an easy decision for me to stay with David."[20]

- **Owen Anderson**: "David did not solicit my business or urge me to do anything with my account. I took steps to find his information, I initiated contact with him, and I asked him if we could continue working together."[21]

- **Kathie Anderson**: "David did not contact me to let me know that he had left TIAA-CREF Individual and Institutional Services, LLC ("TIAA"). When we realized that David was no longer working at TIAA, my friend provided David's contact information to my husband. My husband then contacted David about continuing to work as our financial advisor…David did not solicit my account."[22]

---

[16] See Declaration of Jeannette McBrearty (Ex. **6** at Ex. 2, ¶ 7).
[17] See Declaration of Paula Smith (Ex. **8** at ¶¶ 4-5; Ex. **6** at Ex. 2, ¶¶ 4-5).
[18] See Declaration of Richard Babaian (Ex. **6** at Ex. 2, ¶¶ 4-6).
[19] See Declaration of Emma Del Frate (Ex.**6** at Ex. 2, ¶ 6).
[20] See Declaration of Stephanie Diaz (Ex. **6** at Ex. 2, ¶ 5).
[21] See Declaration of Owen Anderson (Ex. **9** at ¶ 6; Ex. **6** at Ex. 2, ¶ 6).
[22] See Declaration of Kathie Anderson (Ex. **10** at ¶¶ 3-4; Ex. **6** at Ex. 2, ¶¶ 3-4).

- **William Cannady:** "David did not solicit me to transfer money from TIAA to Raymond James & Associates, Inc., his new firm.  I contacted David and I asked him about continuing to manage my account."[23]

- **Sau Wai Cheung**: "I asked my new TIAA financial advisor for David's telephone number so that I could contact him. I then spoke with David on the phone and we scheduled a meeting…He did not, however, ask me to transfer my account to him, solicit my business, or encourage me to take my money out of TIAA."[24]

- **Henry W. Marshall, Jr.**: ""[M]y wife and I began talking about the possibility of working with a financial planner. I decided to contact David to learn more about Raymond James and to discuss the possibility of having David work with us…My wife and I decided to open an account with David... However, we did not transfer money from TIAA to Raymond James. Our Raymond James account is funded with money that was not held at TIAA...David never asked me to transfer my TIAA funds to Raymond James and, in fact, I have not transferred TIAA funds to him."[25]

Here, a binding agreement to arbitrate exists and the parties are already arbitrating these same claims in FINRA.  While TIAA has titled this matter as a request for injunctive relief, this was done solely so that it could enter court, under Rule 13804, and pursue depositions to which it would not be entitled in the FINRA Action.[26]  TIAA's real focus is monetary damages based on a liquidated damages provision in the Agreement and it believes that deposition testimony obtained during its brief time in court will support its claims in the FINRA Action.  No urgent circumstances exist that would require the Court to consider preliminary injunctive relief on a covenant with only days left before its expiration and which cannot be salvaged or extended.  The parties have a valid arbitration agreement and no grounds exist to maintain this action in Court.  It would also be a waste of judicial resources, especially under the current pandemic, for the Court to consider TIAA's claims on an expiring restrictive covenant when the parties are already litigating these same issues in the FINRA Arbitration Action.

---

[23] See Declaration of William Cannady (Ex. **11** at ¶ 4; Ex. **6** at Ex. 2, ¶ 4).
[24] See Declaration of Sau Wai Cheung (Ex. **6** at Ex. 2, ¶ 4).
[25] See Declaration of Henry W. Marshall, Jr. (Ex. **6** at Ex. 2, ¶¶ 6-8).
[26] See FINRA Code Rule 13510 (Ex. **12**) ("Depositions are strongly discouraged in arbitration. Upon motion of a party, the panel may permit depositions, but only under very limited circumstances…").

## ARGUMENT

### I.     MOTION TO DISMISS

### A.  Mr. Ahlquist's Covenants Expire On May 26, 2020.

A party may bring a motion pursuant to F.R.C.P. 12(b)(1) for lack of subject matter jurisdiction on the grounds that a claim is moot.[27]  Throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable decision.[28]  As the Fifth Circuit Court of Appeals has recognized, "[i]f a dispute has been resolved or if it has evanesced because of changed circumstances, including the passage of time, it is considered moot."[29]

Texas law is clear: injunctive relief is not available after a restrictive covenant expires.  See Weatherford, 340 S.W.2d at 953; Leath v. Tracer Const. Co., 2009 WL 8188138, at *8 (E.D. Tex. Aug. 18, 2009) (Movant "may not be awarded injunctive relief because the contractual obligations encompassed within the covenant have expired, rendering any injunction claim moot."); Leon's Fine Foods, Inc. v. McClearin, 2000 WL 277135, at *1 (Tex. App.- Dallas Mar. 15, 2000) (not designated for publication) ("Once the non-competition period ends, the trial court's ability to enforce the covenant by injunction becomes moot.").   When the temporal terms of a non-solicitation agreement have expired, the covenants are of no effect, and an employee who may have once been bound by them can no longer be found in breach.  See Henry F. Coffeen III Mgmt., Inc. v. Musgrave, 2016 WL 6277375, at *4 (Tex. App.- Ft. Worth Oct. 27, 2016) (holding that, because covenants' two-year term had expired, "the noncompete and antisolicitation provisions do not restrict [former employee's] post-termination activities, and [former employer] therefore did

---

[27] Thompson v. United States, 2007 WL 1412308, at *3 (N.D. Tex. Apr. 19, 2007), report and recommendation adopted, 2007 WL 1536933 (N.D. Tex. May 21, 2007).
[28] Id.
[29] Am. Med. Ass'n v. Bowen, 857 F.2d 267, 270 (5th Cir. 1988).

not show a probable right to recovery on its claim that [former employee] breached the Non-Compete Agreement" and determining that the trial court had not abused its discretion by denying the former employer's application for a temporary injunction.); <u>Rimes</u>, 542 S.W.2d at 912 ("Here, the parties entered into a contract providing for a noncompetitive period following cessation of employment and such period is now past which causes the issue to become moot").

Pursuant to the parties' agreement to arbitrate, TIAA can only seek temporary injunctive relief in this Court action.[30]   Therefore, since an injunction cannot be issued after a covenant expires, and because TIAA cannot proceed in this Court action beyond the temporary injunction stage, no grounds exist for this case to remain in Court.

TIAA has known about the expiration date on the covenants; it knew about the alleged circumstances that form the basis for its claims for months before it filed this action;[31] it did not seek a temporary restraining order;[32]  and it deliberately waited for weeks until it even attempted to serve Mr. Ahlquist.[33] TIAA has placed itself in this position where it is attempting to enforce expiring covenants at the last minute.  Mr. Ahlquist should not be required to continue defending against TIAA's untimely claims in Court, especially when he is already defending against these same claims in the FINRA Action.

Regardless of enforceability (and for many reasons the non-solicitation covenant is unenforceable as drafted), Mr. Ahlquist has honored the obligations in the Agreement since his resignation from TIAA.  He has served his time.  He should not be unilaterally forced to comply with additional restrictions beyond those contained in the Agreement, particularly when he has not

---

[30] <u>See</u> Rule 13804(a) of the FINRA Code (Ex. **3**).
[31] <u>See</u> Docket No. 1 at ¶¶ 17-18.
[32] <u>See</u> TIAA's Motion for A Preliminary Injunction And Expedited Discovery (Docket No. 3).
[33] <u>See</u> TIAA's Motion for Substituted Service of Process (Docket No. 9 at ¶ 1).

breached the Agreement.  TIAA has an available remedy and that remedy is an award of monetary damages in the FINRA Action, if the FINRA Arbitration Panel deems it warranted.[34]

### B.  The Covenant Cannot Be Extended Through The Agreement.

In addition to the one-year non-solicitation provision, the Agreement also contains a provision stating that the temporal term of Mr. Ahlquist's non-solicitation covenant "shall be automatically extended by any period of time that [Mr. Ahlquist] is or has been in breach" of the covenant.[35]  Texas courts find these types of provisions to be unreasonable and unenforceable, based on the indefiniteness of the purported restraint.

In Cent. States Logistics, Inc. v. BOC Trucking, LLC, 573 S.W.3d 269 (Tex. App. - Houston [1st Dist.] 2018), reh'g denied (Dec. 13, 2018), review denied (Oct. 4, 2019), the Defendant entered into an agreement whereby it agreed that it would "not to attempt to divert the business of any client of [Plaintiff's] to any competitor of [Plaintiff] for the duration of the contract and for two years after [Defendant's] last contact with any client of [Plaintiff]." Id. at 273.  The court determined that the covenant not to compete was unenforceable where the covenant provided no discernible method to know when the non-compete period had expired other than specifying the "last contact with any client or clients." Id. at 277.  Similarly here, the Agreement provides no discernible way to determine when the breach may have occurred, and how to properly extend the restriction period.

In Cardinal Personnel, Inc. v. Schneider, 544 S.W.2d 845, 846 (Tex. Civ. App. 1976), the Court of Civil Appeals addressed the validity of a restrictive covenant that was augmented by an equitable provision in a separate paragraph that would begin to run on the date when "EMPLOYEE ceases to be employed or engaged in violation thereof, whether voluntarily or by injunction." Id.

---

[34] Mr. Ahlquist disputes that TIAA is entitled to any monetary damages.
[35] See Docket 1-2 at 5, ¶ 2(e).

at 847.  The <u>Cardinal Personnel</u> court "disregarded as unenforceable and void" the equitable extension provision, holding that "the covenant constructs a time frame ascertainable only by hindsight; i.e., the duration of the contract cannot be determined until the jurisdiction of the trial court is invoked and its equity powers exercised." <u>Id.</u>  Here, the language of the Agreement also imposes a time period that is only ascertainable by hindsight.  The Agreement's extension period may only be determined when a court determines that any such breach of the Agreement occurred.

In <u>IKON Office Sols., Inc. v. Furnish</u>, 2007 WL 9702416 (W.D. Tex. Oct. 31, 2007), <u>report and recommendation adopted,</u>  2008 WL 11408513 (W.D. Tex. Feb. 11, 2008), the employee's agreement contained a 12 month covenant and a tolling provision, similar to the one at issue here, that stated "the period of restraint ... shall be automatically tolled for the amount of time the violation continues." <u>Id.</u> at *8. The Western District of Texas found that the tolling provision was unreasonable because it created an indefinite period in which the employee's actions were restrained and an indefinite time at which the non-compete began.  <u>Id.</u> at *9.

Given that the terms of the extension provision contained in the Agreement are indefinite, and based on the vague, and unascertainable, "period of time that [Mr. Ahlquist] is or has been in breach," Texas law dictates that such a provision is unenforceable and Mr. Ahlquist's restrictions cannot be extended pursuant to the language in the Agreement.

## II.    <u>MOTION TO COMPEL ARBITRATION IN THE ALTERNATIVE</u>

When all parties in an action are bound by an agreement to arbitrate, the court has the discretion to dismiss the action.[36]  When claims must be submitted to arbitration, "retaining jurisdiction and staying the action will serve no purpose."[37]

---

[36] <u>See</u> <u>Williams v. Fid. Warranty Servs., Inc.</u>, 2020 WL 2086655, at *3 (S.D. Tex. Apr. 30, 2020).
[37] <u>Id.</u> (quoting <u>Alford v. Dean Witter Reynolds, Inc.</u>, 975 F.2d 1161, 1164 (5th Cir. 1992)).

Under both Texas law[38] and federal law[39], it is axiomatic that arbitration agreements are binding and enforceable and that arbitration must be compelled if arbitrable issues exist. Texas courts recognize that the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq*., conveys an "emphatic federal policy in favor of arbitral dispute resolution."[40] As stated by the Supreme Court of Texas, "[t]he policy in favor of enforcing arbitration agreements is so compelling that a court should not deny arbitration '*unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue.'"[41]

The United States Supreme Court has repeatedly emphasized that the basic tenet of the FAA is to "ensure that commercial arbitration agreements, like other contracts, 'are enforced according to their terms'" and "according to the intentions of the parties." See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 946-47 (1995).[42] Here, the parties' agreement expressly contemplates arbitration in FINRA as governed by the FINRA Code. The Court's analysis should therefore begin (and end) with the text of the pertinent rules.[43] Consistent with the purposes of the FAA, the Court should direct the parties to resolve their dispute before FINRA.

---

[38] Tex. Civ. Prac. & Rem. Code § 171.001.

[39] 9 U.S.C. § 2.

[40] In re Am. Homestar of Lancaster, Inc., 50 S.W.3d 480, 484 (Tex. 2001) (quoting Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc., 473 U.S. 614, 631 (1985)).

[41] Prudential Sec. Inc. v. Marshall, 909 S.W.2d 896, 899 (Tex. 1995) (emphasis in original)(citation omitted).

[42] The FAA applies equally in state or federal court when the dispute concerns a "contract evidencing a transaction involving commerce." Jack B. Anglin Co., Inc. v. Tipps, 842 S.W.2d 266, 269-70 (Tex. 1992) (orig. proceeding). Even when there is no express agreement to arbitrate under the FAA, a party may establish the applicability of the FAA by showing that the transaction affects or involves interstate commerce. See Stewart Title Guar. Co. v. Mack, 945 S.W.2d 330, 333 (Tex. App.—Houston [1st Dist.] 1997, writ dism'd w.o.j.). Actions involving enforcement of securities industry arbitration agreements have been held to involve interstate commerce, and consequently are governed by the FAA even if they are pending in state courts. See, e.g., Salvano v. Merrill Lynch, Pierce, Fenner & Smith Inc., 85 N.Y.2d 173, 180, 647 N.E.2d 1298 (1995).

[43] See, e.g., UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 648-49 (2d Cir. 2011) (FINRA members had agreed to comply with FINRA's rules, which courts apply according to their terms). In addition to FINRA Rules, in order to buy and sell securities for public investors, a financial advisor must execute FINRA's Form U4 which also contains an arbitration agreement similar to what is contained in the FINRA Rules. An advisor's executed Form U4 is a contract involving the sale of securities and thus involves interstate commerce. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 21–25 (1991) (implicitly holding that FAA is applicable to a Form U4). A Form U4 is a "separate contract involving the sale of securities, and its arbitration clause is enforceable under the FAA." In re Scott, 100 S.W.3d 575, 579 (Tex.App.-Ft. Worth 2003) (orig. proceeding) (citing Williams v. Cigna Fin. Advisors, Inc., 56

In determining whether a claim falls within the scope of an arbitration agreement, the focus is on the factual allegations, rather than the legal causes of action asserted.[44]  While TIAA is requesting injunctive relief, this is mere titling used to take advantage of a limited exception to the parties' obligation to arbitrate, so that it can attempt to obtain depositions in court, which it would not be entitled to obtain in FINRA.  The allegations pertain to a dispute between a FINRA Associated Person (Mr. Ahlquist) and a FINRA Member ("TIAA") that fall within their arbitration agreement and on which TIAA is seeking monetary damages in the pending FINRA Action.

## A.  **The FINRA Rules Are Directly At Issue.**

While TIAA presents this case as a pure breach of contract matter, in actuality, the circumstances here are directly governed by FINRA and the relief that TIAA is seeking jeopardizes firmly-established financial industry principles and guidance and the fundamental rights of the investing public.  Given that the issues directly relate to FINRA rules and principles, and based on the parties' agreement to arbitrate these issues before a FINRA Arbitration Panel, the parties should be directed to proceed in FINRA arbitration.

### 1.  The FINRA Code Governs This Dispute.

Under the FINRA Code, the parties are independently bound to resolve this dispute through arbitration.  Rule 13200(a) of the FINRA Code provides broadly that:

> Except as otherwise provided in the Code, a dispute *must* be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among:

---

F.3d 656, 659-60 (5th Cir. 1995)).  Because Mr. Ahlquist's Form U4, which he was required to execute when he joined TIAA, also contains an arbitration agreement between him and TIAA, and since the Form U4s are contracts involving the sale of securities and the sale of securities involves interstate commerce, the FAA necessarily governs matters relating to the arbitration filed by TIAA.  See In re Merrill Lynch, 131 S.W.2d 709, 712 (Tex.App – Dallas 2004) (holding that a Form U4 is an arbitration agreement involving interstate commerce subject to the FAA).

[44] Marshall, 909 S.W.2d at 900.

- Members;

- Members and Associated Persons; or

- Associated Persons.[45]

Pursuant to Rule 13200, TIAA and Mr. Ahlquist are both required to arbitrate this dispute.  TIAA cannot proceed in this Court action by taking advantage of the limited exception under Rule 13804, and classifying its request as one for "temporary injunctive relief", when it is actually seeking (1) monetary damages based on the liquidated damages clause in the Agreement and is actively pursuing damages in the FINRA Action; (2) discovery in this Court action to which it would not be entitled under the FINRA Code, with the intent to use such discovery in the FINRA Action; and (3) to unilaterally extend the expiring covenant in the Agreement.

### 2.   FINRA Protects Clients' Rights When Their Broker Changes Firms.

It is a fundamental right of an investor to choose with whom he or she does business, and the fact that a broker changes firms should not affect an investor's ability to continue . . . to do business with that broker.[46]

TIAA is actively attempting to harm the interests of the investing public and, in particular, the clients who have relied on Mr. Ahlquist for financial support and guidance for years.  These client needs are especially critical with the drastic market volatility that is presently occurring as a result of the existing pandemic.  The relief that TIAA now seeks undermines the clients' fundamental right to make an informed decision about who should manage their investments.

FINRA Arbitration Panels and courts across the country have long recognized that public securities customers have a right to deal with the broker of their choice.  Recognizing this principle, and consistent with its purpose in protecting securities customers, in May 2001, the Board of Governors of the NASD (now FINRA) issued NASD Notice to Members 01-36, stating:

---

[45] Ex. **2**.
[46] Robert R. Glauber, former Chairman and CEO of the NASD (Ex. **13**).

> NASD Regulation believes that as a matter of policy, customers should have the freedom to choose the registered representatives and firms that service their brokerage accounts.[47]

Subsequently, in 2001, the SEC approved the adoption of IM-2110-7, which provides as follows:

> It shall be inconsistent with just and equitable principles of trade for a member or person associated with a member to interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative, . . . .Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account.[48]

The NASD Rules and Interpretive Materials "make it clear that clients must have free access to registered representatives of their choice and that it is inconsistent with just and equitable principles of trade for a member or person associated with a member to interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative."[49]

State regulators have also responded to firms' continued attempts to interfere with a client's relationship with their broker.  In 2001, the North American Securities Administrators Association ("NASAA")[50] stated: "State securities regulators believe, as a matter of public policy that customers should have both the freedom to choose their brokers and full and free access to their accounts."[51]

Enforcing TIAA's covenants would "interfere with a customer's request to transfer his or her account" because if a broker is prevented from contacting clients regarding his whereabouts,

---

[47] See Ex. **14**.
[48] See Ex. **15**.
[49] See H&R Block Financial Advisors, Inc. v Majkowski, 410 F. Supp. 2d 1 (D.D.C. 2006) (citing NASD IM 2110-7 and NASD Rule 11870); see also FINRA Rule 2140 (Ex. **16**) ("No member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative…").
[50] NASAA is an association of state and provincial securities regulators and its membership includes the securities regulators from all 50 states.
[51] See Ex. **17**.

in effect, the client is prohibited from choosing whether to transfer their account.  There is no way for a client to make this choice if they are unable to locate their broker.[52]

Both courts and FINRA recognize the importance of allowing brokers to contact and continue servicing their clients, subsequent to the broker's move to a new firm.  Indeed, "FINRA encourages investors to ask questions to reach an informed decision about whether to transfer their assets to the broker's new firm."[53]   FINRA recently took this position one step further by releasing Regulatory Notice 19-10 ("RN 19-10"), which confirms the importance of a client having their broker's new contact information when the advisor switches firms.  It also reiterates the importance of client choice, stating (emphasis supplied):

- [A member firm] should provide timely and complete answers, if known, to all customer questions resulting from a departing representative, so **that customers may make informed decisions about their accounts**.[54]

By releasing RN 19-10, FINRA is formally advising the financial industry that it is imperative for a client to be able to communicate with their broker, and to have the broker's new contact information, after they move to a new firm.  The rationale for this is simple – a client must be able to talk to their broker to make a fully informed decision about who will handle their account.

---

[52] The relationship between a broker and a client is unique.  See Edward D. Jones & Co., L.P. v. Kerr, 415 F. Supp. 3d 861, 876 (S.D. Ind. 2019) (quoting Bank of America Inv. Services, Inc. v. Byrd, 2009 WL 10184606, at *9 (E.D. Va. June 15, 2009) ("[c]ourts have characterized the relationship between a financial advisor and her clients as 'a personal relationship dependent on personal trust,' vesting in the clients the right to be fully informed about the status of their accounts by the advisor with whom they are familiar and have an established relationship.")

[53] See Transferring Your Assets: 5 Tips to Consider When Your Broker Changes Firms, FINRA.org, June 21, 2016 (Ex. **18**).

[54] RN 19-10 continues as follows: A member firm should communicate clearly, and without obfuscation, when asked questions by customers about the departing registered representative. Consistent with privacy and other legal requirements, these communications may include, when asked by a customer:

  (1) clarifying that the customer has the choice to retain his or her assets at the current firm and be serviced by the newly assigned registered representative or a different registered representative or transfer the assets to another firm; and

  (2) provided that the registered representative has consented to disclosure of his or her contact information to customers, providing reasonable contact information, such as phone number, email address or mailing address, of the departing representative.

As with all communications with customers, information provided by the member firm about the departing registered representative must be fair, balanced and not misleading.  Ex. **19**.

TIAA is not simply trying to enforce a contract- it is attempting to prevent Mr. Ahlquist's clients from receiving information that is necessary for them to determine in whose hands they place their financial futures, and thus preventing clients from making informed decisions about their investments.  This conduct violates firmly-established financial industry principles.

### 3.   The Agreement's Liquidated Damages Provision Violates FINRA Rules.

The Agreement contains a liquidated damage clause which effectively prohibits Mr. Ahlquist from providing services to clients unless he is willing to pay an exorbitant penalty to TIAA.  While unenforceable, this language flies in the face of FINRA rule and policy as it seeks to penalize Mr. Ahlquist if clients decide to continue working with him.  Therefore, it encourages Mr. Ahlquist to reject clients, who desire to have him manage their investments, because he would be subject to harsh financial penalties as a result.  At its core, this is another aspect of the case that directly incorporates FINRA rule and policy, which rejects this type of penalization when a client decides who should manage their investments.  To the contrary, FINRA encourages clients to make an informed decision about who should manage their accounts and FINRA wants clients to work with the broker who they believe will best manage their investments.

The Texas Supreme Court in <u>Peat Marwick v. Haas</u>, 818 S.W.2d 381 (1991), provides clear legal guidance for this case.  The Court, *inter alia*, determined that a liquidated damages provision for violation of a restrictive covenant must be reviewed together with and on the same basis as a restrictive covenant.  <u>Id.</u> at 386.   Among other basis, the Court reasoned as follows:

> If the damages provided are sufficiently severe, then the economic penalty's deterrent effect functions as a covenant not to compete as surely as if the agreement expressly stated that the departing member will not compete. The practical and economic reality of such a provision is that it inhibits competition virtually the same as a covenant not to compete.

Id. at 386-87.   TIAA's grossly penal liquidated damages clause is tantamount to a non-compete clause.  Not only does this impact Mr. Ahlquist's ability to work in his chosen profession as a financial advisor, but it directly harms his clients who could be denied the opportunity to work with their chosen broker because he would be required to pay substantial fees as a result.

### B.   The Parties' Are Actively Arbitrating These Issues In FINRA.

Rule 13209 of the FINRA Code states:

> During an arbitration, no party may bring any suit, legal action, or proceeding against any other party that concerns or that would resolve any of the matters raised in the arbitration.[55]

Therefore, under the parties' arbitration agreement, the appropriate procedure is to compel the parties to proceed with the FINRA Action where a panel of FINRA arbitrators decides the case on the merits (or to dismiss this case and permit the parties to proceed with the FINRA Action).

As the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, **shall** on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . .[56]

Texas law strongly favors arbitration as well.[57]  Texas courts interpreting the FAA have held that a party seeking to compel arbitration under the FAA must establish only that: (a) there exists a valid agreement to arbitrate; and (b) the disputed claims fall within the scope of that agreement.[58]

---

[55] See FINRA Rule 13209 (Ex. **20**).

[56] See 9 U.S.C. § 3 (emphasis added); see also id. § 4 (requiring the court, upon application of any party, to "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement" to arbitrate).

[57] See, e.g., Rachal v. Reitz, 403 S.W.3d 840, 842 (Tex. 2013); Cantella & Co., Inc. v. Goodwin, 924 S.W.2d 943, 944 (Tex. 1996) (orig. proceeding) (per curiam).

[58] In re FirstMerit Bank, 52 S.W.3d 749, 753-54 (Tex. 2001) (orig. proceeding).

TIAA cannot challenge the overall enforceability of the parties' arbitration agreement or the FINRA Code to which it is bound, and, therefore, this Court "has no discretion but to compel arbitration." Shearson Lehman Bros., Inc. v. Kilgore, 871 S.W.2d 925, 928 (Tex. App.—Corpus Christi 1994) (orig. proceeding); see also In re Odyssey Healthcare, Inc., 310 S.W.3d 419, 422 (Tex. 2010) ("A trial court that refuses to compel arbitration under a valid and enforceable arbitration has clearly abused its discretion."). Inherent within Texas public policy favoring arbitration is the notion that once an arbitration proceeding has commenced—as is the case here—arbitration should proceed without obstruction from the judiciary.[59]

### C.      TIAA Is Using This Case To Obtain Impermissible Discovery

By seeking expedited discovery in the Court action, especially when it has already served comprehensive discovery in the FINRA Action, TIAA is attempting nothing more than an "end run" around the rules to which the parties have agreed to arbitrate.

The FINRA Code strongly discourages the use of depositions:

> ***Depositions are strongly discouraged in arbitration.*** Upon motion of a party, ***the panel may permit depositions***, but ***only under very limited circumstances***, including:
>
> • To preserve the testimony of ill or dying witnesses;
>
> • To accommodate essential witnesses who are unable or unwilling to travel long distances for a hearing and may not otherwise be required to participate in the hearing;
>
> • To expedite large or complex cases;
>
> • In cases involving claims of statutory employment discrimination, if necessary and consistent with the expedited nature of arbitration; and
>
> • If the panel determines that extraordinary circumstances exist.[60]

---

[59] See Feldman/Matz Interests, L.L.P. v. Settlement Capital Corp., 140 S.W.3d 879, 885 (Tex. App.- Houston [14th Dist.] 2004) (citations omitted).
[60] FINRA Code Rule 13510 (Ex. **12**).

None of the "very limited circumstances" are present here and TIAA has not articulated any "extraordinary circumstances" that would warrant deviating from FINRA's general policies.

The differences in discovery between FINRA arbitration and federal court litigation unquestionably are substantial. Yet these differences do not provide a basis for the case to remain in court. The Court of Appeals of Texas has specifically stated that the differences in discovery practice between court and FINRA arbitration are not grounds to ignore an arbitration agreement:

> [Defendants] also counter the motion to compel arbitration by arguing that FINRA's limitations on discovery renders arbitration an improper forum for resolving the employment claims. Because the trial court has no choice but to grant a motion to compel where the movant has established an agreement exists and the claims raised are within the agreement's scope, their discovery-limitation argument has no merit.[61]

Because this matter is to be arbitrated pursuant to the FINRA rules, it would be improper and unfair for TIAA to attempt to avail itself of materially different discovery procedures and tools available under the F.R.C.P. It is a fundamental tenet of FAA[62] jurisprudence that "arbitration is a matter of contract," AT&T Tech., Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986), and that parties may only be required to arbitrate "in the manner provided in such agreement." FAA, 9 U.S.C. sec. 3. See, e.g., Volt Info. Sciences v. Leland Stanford Jr. Univ., 489 U.S. 468, 476 (1989) (stating that the primary policy and purpose of the FAA is to "ensure the enforceability, *according to their terms*, of private agreements to arbitrate") (emphasis added).

Consequently, parties may not be forced to arbitrate in a manner or under rules that are different from those to which they agreed. See Volt, 489 U.S. at 479. "[P]arties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate [citation omitted] **so too may they specify by contract the rules under**

---

[61] In re Stanford Grp. Co., 273 S.W.3d 807, 815 (Tex. App.- Houston [14th Dist.] 2008).
[62] The body of federal substantive law generated by elaboration of § 2 of the FAA is equally binding on state and federal courts. See Vaden v. Discover Bank, 556 U.S. 49, 1271 (U.S. 2009).

**which that arbitration will be conducted."** Id. (emphasis added).  Here, this matter is to be arbitrated pursuant to an agreement to arbitrate in accordance with the FINRA Code.  The FINRA Code has very specific rules and guidelines, embodying articulated policies, that prescribe what types of discovery are appropriate and – just as importantly – what types of discovery are *inappropriate*.  As the United States Supreme Court held in Volt, parties are free to "specify by contract the rules under which [] arbitration will be conducted." Id.  Having specified the discovery rules under which they will proceed, the parties to this case cannot be required to submit to an altogether different set of discovery rules at the whim of one party.  See, e.g., Salvano, 647 N.E.2d at 1303 (holding that "to read into the NYSE [Arbitration] Rules a provision authorizing [a certain procedure] would be to fundamentally modify the terms of the contract and force respondent to arbitrate in a manner contrary to the agreement to which it has assented.") (citing Volt).  Indeed, New York's high court noted in Salvano that, "[t]o be sure, in arbitration as in other areas, the procedures of the law can be used for personal advantage, by employees no less than employers," and that "[t]he protection against being prejudiced by such maneuvering in arbitration cases is a contract which clearly and unambiguously sets forth the rights of both parties."  Salvano, 647 N.E.2d at 1304.  The FINRA Code represents precisely such an effort to "clearly and unambiguously set forth the rights of the parties" as to how they are going to arbitrate and, the manner in which discovery will be conducted in an arbitration case.  TIAA's request for expedited discovery amounts to nothing more than an "end run" around the rules under which the parties have agreed to arbitrate.

A party seeking expedited discovery has the burden of showing good cause for the requested departure from standard discovery procedures.[63]  Under the circumstances of this case,

---

[63] Malibu Media, LLC v. Doe, 2019 WL 4003086, at *2 (W.D. Tex. Aug. 23, 2019).

where TIAA has initiated a FINRA arbitration proceeding, has already served comprehensive discovery, and where no good cause exists, TIAA is simply using this Court proceeding as a way to backdoor the FINRA Code and obtain depositions to which it is not entitled.

## **CONCLUSION**

For these reasons, Mr. Ahlquist respectfully requests for the Court to grant his Motion to Dismiss pursuant to F.R.C.P. 12(b)(1) and for the claims against him to be dismissed with prejudice.   In the alternative, Mr. Ahlquist requests for the Court to compel the parties to proceed with the arbitration of their disputes in the FINRA Action.

Respectfully submitted,

/s/ *Arthur V. Lambert*
Arthur V. Lambert
Attorney-in-Charge
State Bar No. 11841250
Federal Bar No. 18785
FISHER & PHILLIPS LLP
500 North Akard, Suite 3550
Dallas, Texas 75201
Telephone: (214) 220-9100
Facsimile: (214) 220-9122
*alambert@fisherphillips.com*

**ATTORNEYS FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of May, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to Plaintiff's counsel of record:

Amy M. Stewart, Esq.
Stewart Law Group
1722 Routh Street
Suite 745
Dallas, TX 75201
(469) 607-2300
astewart@stewartlawgrp.com

Christopher C. Coss, Esq.
Coss & Momjian, LLP
111 Presidential Boulevard
Suite 214
Bala Cynwyd, PA 19004
(610) 667-6800
ccc@cossmomjian.com

/s/ *Arthur V. Lambert*
Arthur V. Lambert